Mr. Matthews, whenever you're ready. Good morning, Your Honors. Matt Matthews for the appellant CleanChoice Energy. The central question in this case is whether the parties formed a valid arbitration agreement under New York law which applies an objective standard to contract formation. The district court, though, effectively held CleanChoice to an actual notice, a subjective actual notice standard and an express assent standard. And rather than the objective inquiry notice and objective assent inquiry. As for notice, CleanChoice established that the arbitration agreement was sent via New York's mailbox rule to Misutico, which established a presumption of receipt. And as to assent, courts regularly find assent in circumstances like these where a customer receives the contract through the mailbox rule, has an opportunity to cancel or opt out and goes forward with the terms of service. And so the subsequent terms say that you can acknowledge acceptance by signing. Right. Your Honor, my reading of that is that it is a reference to the prior enrollment form that Misutico signed and returned. What it says is your get the exact language you're signing this agreement. I believe it says the undersigned in the subsequent terms. And that suggests that they I mean, at best it's sloppy, but it's I think a fair reading is that you got to sign it for this to be effective. I would I would agree that it could have it does say the underside. You're absolutely right. I don't dispute that. And I would agree that it could be drafted better. I think that but looking at the totality of the circumstances, I don't think that that would create confusion. The bills also don't say anywhere as some other bills I believe do that. You know that when you make a payment that that constitutes acceptance of the subsequent terms. That's another thing you could have done. State on the bills that by accepting the terms and I saw the bills, I didn't see that kind of language, which I have seen another. I don't. These terms were sent before any billing started. It was before the Ms. Weinberg had paid anything to Clean Choice. And that's that's important in the Yoshida case, which is cited in our briefs. It's the case that's most applicable to our facts. It involves an ESCO that sent subsequent terms after an enrollment like this. The court noted that the party had an opportunity to opt out. And the facts are the same in that the party was not given advance notice that the terms would be sent. And but the defendant established through the mailbox rule that inquiry notice applied and that the customer after receiving the terms. The mailbox rule does that much for you. Let me ask you one more thing on the enrollment agreement, though. There it says that the terms could be modified if they're impacted by regulatory changes and with 30 days notice. Were either of those satisfied here? This change was not made. 30 days notice was was not given. No, you're right. But this was not a change driven by a regulatory change. And that that provision is not a limitation on Clean Choice's ability to revise the terms. It's a it's an obligation on Clean Choice to provide 30 days notice in the event that there is a regulatory change. This this argument was made between the same council recently in a case in the northern district of Illinois. It's it's noted in our reply brief because the decision came out, I think, the day of or day before the Beauchat versus Ambit case. And the court there found that that regulatory change provision, again, was not a limitation on Clean Choice's ability to revise the agreement. I guess what I'm struggling with helped me understand why a reasonable person in the position of Mrs. Sudico believe that an envelope that she receives that did not indicate that it was from Clean Choice would contain a modification to an earlier contract she had signed. Yes. How how does that constitute inquiry notice or put a reasonable person on notice? They've already signed the contract. I'm happy to address that, Your Honor. Thank you. The envelope that was sent is noted in our briefs that it contained important information about your new clean energy subscription. Any reasonable consumer who had just filled out an enrollment form for a new clean energy subscription that said it would, quote, begin enrollment would expect some sort of enrollment confirmation. A reasonable consumer, given that the communications had only been via the mail, would also expect that confirmation to come through the mail and would pay attention to a announcement that it contained important information. You apply for a credit card, you sign up with the company, you always get that welcome package. That doesn't put you on notice that, whoa, they changed the contract on me. I'm not sure that that would be sufficient. Well, the credit card contact is an interesting one. There are a number of cases that are cited in our briefs in which credit card companies do just that and are held to have assented to the terms because they didn't cancel service after receiving them. But the initial enrollment form was very detailed, including terms about dispute resolution and all kinds of provisions about cancellation fees, says it's the whole agreement. It looks like a very detailed contract. It's not just a check the box, we're welcome, we look forward to working with you, and your contract will come later. So it seemed to me that a reasonable consumer could look at this and understand that it meant what it said. This is how disputes will be resolved, and this is how this is the whole agreement. So I'm not so sure that absent a flag that this is the real contract that you're going to get later, that a reasonable consumer would be bound to accept the second. I would say that in terms of advance notice of subsequent terms being sent, that I'm not aware of any case other than this one in the paper contract context, mailbox rule notice has been established, and there's been an opportunity to cancel after receiving amended terms where a district court has denied a motion to compel arbitration because of the lack of advance notice. The case is stable. You're going to distinguish because of paper versus email. But I mean, there the rationale, the core of it seemed to be that it was notice depended on calling new terms to the plaintiff's attention. And that doesn't look like it was done here. I think that was certainly a part of it, and the totality of the circumstances that was considered by the court. But what's completely different is Schnabel, the plaintiffs weren't even aware that they had enrolled with the defendant. And we're not, you know, it wasn't reasonable to put them on the lookout for what this court called an unexpected email. Here, the plaintiff was absolutely aware that she had enrolled with Clean Choice. And as I mentioned, it's reasonable for someone who had begun enrollment to pay attention to an envelope that said important information was enclosed. And if she had opened that envelope, a reasonable person would have seen exactly who it was from and that the contract at the top said New York residential and small commercial agreement. And then a little lower. So in your view, they could have sent her an entirely different contract from the one that she originally signed in the enrollment. And she would have been bound by that if she hadn't canceled within 30 days after, regardless of whether she had started paying already and whether a complete contract had already been entered into by the initial back and forth. I think the fact that she had not already entered into the, had not begun service is something that the courts do consider. I would say that that is an important fact on this. But yes. But basically, yeah, you could, your client could rewrite the whole contract and change all of the terms, maybe including price. No, not price. Not price. But everything else. That's a material change. So dispute resolution, choice of law, warranties of service, in every respect, it could be redone. I believe that's the law when notice is provided and there's an opportunity to cancel or opt out. And there are numerous credit card cases that are cited in the briefs, Edwards and Valley, which also cites a first department case with circumstances like those where there were significant changes to the contract. But what was sent was obviously a contract, as we have here, and didn't mislead a consumer. That's the sort of situation where courts, like the Lipset case from last year, where courts have said this, a reasonable consumer. Why is it misleading to have the contract even be very similar, but not to call the operative important change to the consumer's attention, rather than just send a whole? A disclosure could always be more conspicuous or clearer. Judge Halpern below said that the arbitration provision itself was clearly delineated in a separate section under choice of laws, which is a place that you would expect it to be. That wasn't an issue for- Under choice of law? Yes. It should have been under dispute resolution. Under dispute resolution. It's not a choice of law. Well, it is in the sense that it's- A choice of forum. Forum. You're right. The provision also says New York law will apply. But the issues that you mentioned with the reference to the underside, those were also in Mr. Weinberg's agreement, and the court didn't find under the totality of circumstances that it was any issue for them. There's not a signature block at the end. I think for a reasonable consumer, it wouldn't create confusion about whether or not a signature was required to enroll, particularly because, as I said, I believe that those signature requirements refer back to the enrollment agreement, which is defined to be part of the agreement. It says by your signing this agreement, you agree to initiate certain- Thank you, counsel. You have reserved a few minutes. Thank you. Good morning, Your Honors. I'm Greg Blankenship with Finkelstein, Blankenship, Frey, Pearson, and Garber for the plaintiffs. I just want to address a few things to clarify the record a little bit. The subsequent terms don't just refer to the underside. They specifically say, quote, by signing the agreement, the customer agrees to those terms. There is no question that either Schnabel or generally New York law, not just related to e-commerce, that in order for new terms to become effective when there's a preexisting contract, not only do those new terms have to be called to the attention of the consumer, but notice of the type of conduct that will result in acceptance of those terms has to be provided. What does called to the attention of the consumer mean in this context? I think your friend is saying that putting important information on the envelope of the welcome packet is enough. Why isn't it? What would be enough? Well, Your Honor, I think that what would be enough were the cases that my friend at the bar refers to in the credit card context. For example, in Vale, the letter didn't just say thank you for being a customer and surreptitiously attach the contract. It specifically called out the fact that there were new arbitration agreements being offered. In fact, if you look at all the cases the defendant cites for the proposition that the mailbox rule is enough to meet inquiry notice, they kind of fall into two buckets. One, where there's a cover letter that does in fact explicitly call out the fact that there are new changes in the offing. Or two, there are circumstances where the plaintiff didn't contest that had they received the document, they would have had notice. The Yoshida versus Vista case is a perfect example of that. There, the defendant only said I did not get this document. They didn't contest it. Had they received it, there would have been notice. We went back and looked at the docket. And in fact, the cover letter that came with those terms and conditions explicitly said here are your terms and conditions. And the Vista case is much more like the Weinberg situation. Because there, the person signed up online. They weren't given a set of terms and conditions which were later supplanted by new ones. They were just signed up online. They got a welcome letter. Welcome here. Here's your contract. So there was no conflict there. I'd also like to briefly address that, the Beauchette versus Ambit case that my friend at the bar referenced. It's important to note there that that contract did not just say that there could be changes with a regulatory amendment. And that was enough for the court to say, well, it doesn't also say you can't make changes. There was a separate provision in that contract that specifically said that there could be amendments at any time. And so the court relied upon that to say, well, you have this one provision of a regulatory notice, but there's also a separate provision that specifically allowed amendments at any time. And that's, of course, not applicable here. And for what it's worth, we've appealed that decision. So we'll see where that goes. With respect to the contention that, well, sorry, one other argument I wanted to point out. This argument that the regulatory change provision only means that they have to provide notice if they make an amendment for regulatory or governing changes is an entirely new argument. That was never raised before the district court. It's entirely absent from the open brief. And I would respectfully suggest that the court disregard it. I would also like to suggest that it's not a meritorious argument. A much more plausible interpretation of the contract is that it provides the defendant, the original contract, is that it provided clean choice, the unilateral option, to amend the complaint in the face of governing changes. Amend the contract, not the complaint, right? Yes, I'm sorry. Yes, in the contract. Gave the unilateral right if there were regulatory changes, and then there had to be notice. But that doesn't, the negative doesn't apply then that, well, if it's not a regulatory change, we can just change it at any time without any kind of notice, or at least without advance notice. Well, I would submit that that's the circumstance where you really do need advance notice when a company is making amendments, unilateral amendments, that are, of course, detrimental to the other party, without providing any kind of notice. I think that would be a much more plausible and reasonable interpretation. There's certainly no support in the case law for that notion. I guess the only other point I would address is the question of whether or not the Schnabel case is somehow different because it's e-commerce. I think the decision is quite clear. Before they get into e-commerce. It's not because it's e-commerce. It's because the form of the contract made it, was a different vehicle. There's no reason a consumer would have expected an update to come by e-mail when the first one had been by paper, and so, or vice versa. And so that would seem to be an important part of the reasoning, and that's not the case here. Well, Your Honor, I think in the, as I read the Schnabel case, the person signed up online, and I don't think it's accurate to say that they didn't, that the customers didn't have any idea they were signing up for the big fund program offered by the defendant there. There were, the court goes on for a paragraph or two describing the confirmation pages, and explaining how they gave their date of birth and names all to this third party, and agreed that their credit card number could be given to them. So I don't know that it's accurate to say they didn't have any information. But as I understand it, they just did that enrollment and formed a contract where they would pay money for the provision of these benefits. And then later, they were mailed these terms. But there wasn't a, I don't think there was a case where they had separate terms that were mailed and then e-mailed. But in this case, Your Honor, the only, the plaintiffs were never told that they would get new terms and conditions in the mail. They were never told that they would get anything from the mail from Clean Choice. The only thing that they were told is that they might get a confirmation letter from Con Ed. So they certainly could have thought that the envelope that said important information could have been from Con Ed. They also could have thought, a reasonable consumer could think that it's junk mail. I'm sure we're all used to getting envelopes that say that there's important information enclosed. And junk mailers frequently leave their name off it because they don't want you to just throw it away. But even if the person had opened that, they would have then seen the letter, which makes no mention of additional terms and conditions, much less that those terms and conditions are different than the ones that they explicitly signed, much less providing them notice of the type of conduct that would result in an assent except by signing, which is obviously not what happened here. So I don't, unless there's something else that anybody has any questions on, I think I will leave it at that. Thank you, Counsel. Thank you, Your Honors. Thank you, Your Honors. I'll be brief and I'll pick up where Mr. Blankenship left off with the Schnabel case. This is not Schnabel at all. As I mentioned in that case, the plaintiffs didn't even know that they had enrolled. Here, looking at the totality of the circumstances, Ms. Zucco certainly knew she'd enrolled. She received an envelope that said it contained important information about her new clean electricity subscription with a return address from Washington, D.C., which was not going to be from Con Edison. If she'd opened it, she would have seen it was a short eight-page package, five pages of which— If she opened it, because it didn't list who it was coming from, correct? That's correct, but my point is that an objectively reasonable consumer would open such an envelope sent shortly after enrolling in a new clean energy program and would be expecting some form of confirmation. But that package, as to Mr. Blankenship's statement that it didn't specifically say in the cover letter that they are to be noticed, it did say on the contract, which was five pages of that eight-page packet, that it was the agreement. And requiring a separate statement on the cover letter would—it's a slightly different context. It's GBL 34097, but those are disclosure cases that relate to clarity and conspicuousness. They don't require that sort of a cover letter disclosure if the terms are clear and conspicuous. A reasonable consumer, I think, who opened the envelope—and again, I would submit that a reasonable consumer would open that envelope— would see that the five pages of terms were different than the one-page enrollment form. And it's clear where the arbitration provision is and what it requires to cancel or rescind and not be bound by that. One last point, Mr. Blankenship, in reference to the signature language in there. It said by signing—and it may have just been something I misheard or an error. I heard him say, by signing this agreement, you agree to these terms. And I would just point out that's not what the agreement says. It contains verbatim the same language that had been in the enrollment agreement. It says that you agree that by signing this agreement, you agree to initiate electricity supply service and begin enrollment with clean choice. Again, that's what was in the enrollment letter. That's what was in Mr. Weinberg's letter. It wasn't something that caused confusion or ambiguity there. Thank you, counsel. Thank you. We'll take the case under advisement.